UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

MARK HOGAN, *et al.*,

                         Plaintiffs,

         -against-                                    7:16-CV-1325 (LEK/ATB)

FRANK ROSE, *et al.*,

                         Defendants.

_____

<u>**MEMORANDUM-DECISION AND ORDER**</u>

## I.    INTRODUCTION

      This is the latest episode in an interminable litigation saga involving Plaintiffs Mark and

Elizabeth Hogan and several of their neighbors in Grieg, New York that has lasted over a decade

and occupied both the federal and state court systems. This action, in which Plaintiffs have sued

both their neighbors and various local officials under 42 U.S.C. § 1983 and New York law,

concerns disputes over property boundaries and rights as well as allegations of tortious conduct

tangentially related to these property disputes. Four motions for summary judgment were

initially filed in this action. <u>See</u> Dkt. Nos. 82, 83, 94, 96. In a June 1, 2020 opinion, the Court

addressed two of these motions. <u>See</u> Dkt. No. 116.

      This Memorandum-Decision and Order concerns the remaining two motions for

summary judgment—one filed by defendant David Vandewater, a neighbor of the Hogans, Dkt.

Nos. 94 ("Vandewater Motion"); 94-37 ("Vandewater Statement of Material Facts," or

"Vandewater SMF"); 95 ("Vandewater Memorandum"), and the other filed by the Hogans' other

neighbor, defendant Frank Rose, Dkt. Nos. 96 ("Rose Motion"), 96-1 ("Rose Statement of

Material Facts," or "Rose SMF"), 96-36 ("Rose Memorandum"). Plaintiffs filed responses in

opposition to both motions. See Dkt. Nos. 107 ("Response to Vandewater Motion"); 107-4

("Plaintiffs' Memorandum of Law in Opposition to Vandewater Motion"); 107-2 ("Response to

Vandewater Statement of Material Facts" or "Response to Vandewater SMF"); 107-3 ("Hogan

Additional Statement of Material Facts (Vandewater)," or "Hogan Additional SMF

(Vandewater)"); 113 ("Response to Rose Motion"); 113-26 ("Plaintiffs' Memorandum of Law in

Opposition to Rose Motion"); 113-24 ("Response to Rose Statement of Facts," or "Response to

Rose SMF"); 113-25 ("Hogan Additional Statement of Material Facts (Rose)," or "Hogan

Additional SMF (Rose)"). Both defendants filed replies. See Dkt. Nos. 112 ("Vandewater

Reply"); 112-1 ("Vandewater Reply Memorandum of Law"); 115 ("Rose Reply Memorandum

of Law"). Rose also seeks summary judgment on a cross-claim brought by defendant Wilber

Stanford. See Rose Motion; Rose Reply. Stanford did not file any responsive briefing regarding

this cross-claim. Docket.

 For the reasons that follow, the Court grants the Vandewater Motion in its entirety, and

grants in part while denying in part the Rose Motion.

## II. BACKGROUND

### A. Factual Background

 The following facts are relevant to the instant motions for summary judgment. The Court

below recounts the details of two prior legal actions involving factual and legal issues that

overlap with those in this case, because orders in those cases provide necessary context for the

present dispute. The Court also summarizes the facts as developed in the parties' summary

judgment briefs.

### 1.  The Parties and Their Properties

Grieg's Hiawatha Lake subdivision is situated around two lakes, Hiawatha Lake #1 and Hiawatha Lake #2. Vandewater SMF ¶ 2; Rose SMF ¶ 2; Response to Rose SMF ¶ 2. The Lots around Hiawatha Lake #1 are generally identified as Lake Lots Nos. 1-41. Rose SMF ¶ 5; Response to Rose SMF ¶ 5. "Great Lot 24" surrounds the Lake Lots, adjoining each at its rear, non-lakeside boundary. Rose SMF ¶ 5; Response to Rose SMF ¶ 5. Vandewater owns Great Lot 24. Rose SMF ¶ 3; Response to Rose SMF ¶ 3; Vandewater SMF ¶ 2; Response to Vandewater SMF ¶ 2. Rose owns Lake Lots 23 and 24. Rose SMF ¶ 6; Response to Rose SMF ¶ 3. Mark Hogan owns Lake Lots 19, 20, 21, and 22, which are contiguous with Rose's Lots 23 and 24 and bounded on the rear by Vandewater's Great Lot 24. Rose SMF ¶ 7; Hogan Additional SMF (Rose) ¶ 19.

### 2.  The West Action and the Prior Federal Action

In 2006, several members of the West family, who at the time owned property around Hiawatha Lake, filed suit against the Hogans, seeking a determination as to the ownership of a disputed parcel of land and requesting damages for alleged trespass, among other claims and requests for relief. See West v. Hogan v. Vandewater, No. 2006-535 (N.Y. Sup. Ct. April 7, 2010) (the "West Action"). As relevant here, the Hogans in that suit brought a third-party complaint against Vandewater seeking, *inter alia*, a declaration regarding a right of way across Vandewater's property to access the Hogans' Lots 19, 21, and 22. See West Action, Order and J. Upon Verdict (the "West Order") at 3; Rose SMF ¶ 13; Response to Rose SMF ¶ 13.

In that case, the Hogans and Vandewater reached a stipulation as to the Hogans' right of way to their Lots 19, 21, and 22, and this stipulation was memorialized in the court's order resolving that portion of the dispute. West Order at 5–6; Rose SMF ¶ 17; Response to Rose SMF

¶ 17. Specifically, on April 7, 2010, Judge Merrell ordered that the location of the right of way for the Hogans' Lots 19, 21, and 22 is:

> [A]long the common right of way from Chase Lake Road as it proceeds along the east side of Hiawatha Lake 1 and then proceeds in a clockwise direction around Hiawatha Lake 1 to that right of way's intersection with the southeasterly corner of Lot 23, thence along the back lot lines of Lots 19–23, at a width of 12 feet from those back lot lines, terminating at the northerly lot line of Lot 19.

West Order at 5–6.

Subsequent to the West Order, the Hogans filed a lawsuit in this District in 2011 against Vandewater and Rose, among other defendants (the "Prior Federal Action"). That suit largely revolved around a dispute over the location of the back line of Rose's Lot 23, and, accordingly, over the physical location of the right of way designated in the West Order by reference to Rose's back lot line. See Rose SMF ¶¶ 40–42; Response to Rose SMF ¶¶ 40–42; Hogan v. Cty. of Lewis, No. 11-CV-754, 2017 U.S. Dist. LEXIS 109702, at *5 (N.D.N.Y. July 14, 2017) ("The parties and the court believed at the time [of the West Order] that they had resolved the issue of the easement. Unfortunately that was not the case. A dispute arose as to where the back line of Rose's Lot 23 was located.").

As detailed in Judge Rothstein's 2017 opinion after a bench trial in that case, the Hogans had identified and proceeded to use a path to their Lots 22, 21, and 19 that the Hogans maintained was located along the back lot line of Rose's Lot 23 in accordance with the West Order, but that Rose believed to be a pathway above the back lot line, through the middle of his property. Hogan, 2017 U.S. Dist. LEXIS 109702, at *5–6. This dispute concerned Vandewater as well, as his Great Lot 24 abuts the back of Rose's Lot 23. Id. The parties presented competing surveys to justify their respective understandings of the location of the back lot line of Lot 23, with the Hogans presenting 2003 and 2005 surveys by their expert, Stephen Moncreif ("2003

4

Moncreif Survey" and "2005 Moncreif Survey"), and the defendants presenting a 2014 survey by their expert, Duane Frymire ("Frymire Survey"). Id. at *10–17.

The court in the Prior Federal Action ultimately credited the Frymire survey, which confirmed Vandewater and Rose's understanding of the location of the back lot line of Lot 23. Id. at *13–14. Relatedly, the court found that in utilizing his imagined right of way, Mark Hogan had been traversing an area owned by Rose. Id. at *23.

The issue of the location of the back line of Lot 23 was determinative of the resolution of several claims in that action, including one in particular that arose from events relevant to the present suit. Judge Rothstein made the following factual findings: Rose had steel cables, sawhorses, and no trespassing signs installed on the Hogans' purported right of way, in an effort to prevent Mark Hogan from traversing the path; and at different times, Mark Hogan removed each of those items from the path, and then drove away with the items in his all-terrain vehicle ("ATV"). Id. at *21–23. The Hogans claimed that the placement of these items invaded their lawful right of way and constituted a private nuisance. Id. at *23. The Court found, pursuant to the Frymire Survey, that this path was part of Rose's property and not part of the Hogans' right of way, and that Rose thus had a legal right to place those items where he did, and accordingly held that Rose's placement of those items did not constitute a private nuisance. Id. at *24.

### 3. The Facts as Provided by the Parties

The Hogans' claims against Rose and Vandewater center around two separate series of events. First, on several occasions, Rose and Vandewater each contacted the police regarding alleged criminal conduct by Mark Hogan involving trespass on Rose and Vandewater's respective properties and other alleged violations. In connection with these events, the Hogans

5

assert a defamation claim against Vandewater and § 1983 malicious prosecution claims against both defendants.

Second, Mark Hogan recounts that he injured himself in 2015 while traversing what he then maintained was his right of way. In connection with this injury, which Mark Hogan asserts was caused by prior excavation work on the area conducted by Rose, Hogan brings premises liability negligence claims against both Rose and Vandewater.

### a. Facts Relevant to the Malicious Prosecution and Defamation Claims

On different occasions, both Rose and Vandewater contacted the police to report alleged criminal conduct by Mark Hogan.

#### i. Rose's Contact with Law Enforcement

On multiple occasions between the conclusion of the West Action and the issuance of the 2017 order in the Prior Federal Action, Rose installed "No Trespassing" signs, cables, and sawhorses on the path that Mark Hogan treated as his right of way during that period, in order to prevent Mark Hogan from using that path. Rose SMF ¶¶ 27, 31; Response to Rose SMF ¶¶ 27, 31. On various occasions, Mark Hogan removed those items. Rose SMF ¶ 28; Response to Rose SMF ¶ 28. After Mark Hogan removed them, he put them in his vehicle and took them away from the area. Hogan Additional SMF (Rose) ¶ 85. As explained, Rose maintained during this period that Mark Hogan was illegally using this path, Rose SMF ¶¶ 27–31, while Mark Hogan maintained during the same period that this path was his right of way designated in the West Order, Response to Rose SMF ¶¶ 27–31. At present, Mark Hogan still asserts that this path was his legally designated right of way, at least at the time. Id.

On May 15, 2010, Rose contacted the Lewis County Sheriff's Department to report that Mark Hogan had stolen Rose's cables and sawhorses. Rose SMF ¶ 33; Response to Rose SMF ¶

33. Rose gave a supporting deposition to Deputy Brett Croneiser, who responded to Mr. Rose's complaint, along with Sergeant Ryan Lehman, on the same date; e-mailed the two officers photographs of the incidents that Rose had received from his security cameras on May 14 and 15, 2010; and contacted the Sheriff's Department on May 29, 2010, when he next observed Mr. Hogan on his property. Rose SMF ¶ 33; Response to Rose SMF ¶ 33. Mark Hogan maintains that the photographs Rose provided to the officers were "incorrect and/or altered." Response to Rose SMF ¶ 38.

Mark Hogan was subsequently arrested and charged with petit larceny on May 29, 2010, as a result of Rose's complaint and the photographic evidence he provided to the Lewis County Sheriff's Department on May 15, 2010. Rose SMF ¶ 34; Response to Rose SMF ¶ 34. This petit larceny charge was ultimately dismissed on speedy trial grounds. Hogan Additional SMF (Rose) ¶ 92.

On May 30, 2010, Mark Hogan returned the cables and sawhorses he had removed to the Lewis County Sheriff's Department. Rose SMF ¶ 36; Response to Rose SMF ¶ 36.

Rose states that after contacting the police, e-mailing them photographic evidence, and giving a supporting deposition on May 15, Rose did not have any further contact with the authorities regarding Mark Hogan's alleged criminal conduct. Rose SMF ¶¶ 38–39. Mark Hogan, by contrast, maintains that, weeks later, Rose "repeatedly emailed Defendant District Attorneys Moser and Petzoldt as well as Lewis County Sheriff Deputy Lehman successfully urging them to take further legal action against him." Response to Rose SMF ¶¶ 38–39.

### ii. Vandewater's Contact with Law Enforcement

Mark Hogan recounts six instances over a period of roughly six years in which Vandewater contacted the police regarding Mark Hogan's alleged criminal conduct, the first five

7

of which relate only to his malicious prosecution claims, and the sixth of which relates only to his defamation claim. See Hogan Additional SMF (Vandewater) ¶¶ 24–49.

On or about May 15, 2010, Defendant Vandewater contacted the Lewis County Sheriff's Department and reported that Plaintiff Mark Hogan had trespassed on his property. Id. ¶ 24. Vandewater provided the Sheriff's Department with a supporting deposition and photographic evidence purporting to depict the trespass. Id. ¶ 25. Mark Hogan maintains that he had been traveling on what he believed to be his right of way subsequent to the West Order, rather than trespassing on Vandewater's property. Id. ¶ 26. On or about May 15, 2020, Mark Hogan was charged with trespass, based on Vandewater's supporting deposition. Id. ¶ 27.

In early October 2010, Vandewater reported to police that Mark Hogan had trespassed on his property by parking a red Chevrolet pickup truck on Vandewater's land on October 3. Id. ¶¶ 29–30. To support his accusation, Vandewater provided police with photographic images from a nearby camera purporting to depict Mark Hogan's truck, and a supporting deposition. Id. ¶¶ 31, 33. Mark Hogan maintains that the man in the photographs provided to police was not him, and that the truck in the photograph was not his truck. Id. ¶ 31. Mark Hogan maintains that "his truck" had a yellow license plate and a large "4x4" sticker on the rear, while the truck in the photographs had a white license plate and no sticker on the rear. Id. In his affirmation attached to his response to the Vandewater Motion, Mark Hogan maintains that Vandewater at the time had a friend who owned a red truck with a white license plate and no sticker on the rear of the car. Dkt. 107 ¶ 17. He asserts, "upon information and belief," that Vandewater planted his friend's truck, took photographs of the parked truck, and provided those photographs to police. Id. Vandewater requested that New York State police pursue criminal charges against Mark Hogan, and on October 9, 2010, Mark Hogan was charged with trespass based on Vandewater's

supporting deposition. Id. Hogan Additional SMF (Vandewater) ¶¶ 32–33. In his reply

declaration, Vandewater insists that the truck depicted in the photograph is Mark Hogan's truck.

Dkt. No. 112 ¶¶ 18–19.

On July 3, 2011, Vandewater contacted the New York State Police and accused Mark

Hogan of trespass. Hogan Additional SMF (Vandewater) ¶ 34. As is evident from the supporting

deposition Mark Hogan attaches as an exhibit, Vandewater accused Mark Hogan of driving his

blue Volkswagen onto Vandewater's property and making a K-turn with the vehicle on the way

to his driveway. Response to Vandewater Motion, Ex. P. Mark Hogan states that he did not

commit trespass, and that he was at the time taking a necessary route around a boulder

Vandewater had placed that hindered Mark Hogan's access to his own driveway. Hogan

Additional SMF (Vandewater) ¶ 36.

On or about August 27, 2011, Vandewater contacted the New York State Police and

accused Mark Hogan of stealing a "No Trespassing" sign from Vandewater's property. Id. ¶ 37.

The state police subsequently inspected Mark Hogan's truck and house and did not find a sign.

Id. ¶ 38. Mark Hogan denies having stolen a sign. Id. Vandewater and his son provided the

police with supporting depositions. Id. ¶ 39. Vandewater requested in his deposition that police

ensure that Mark Hogan was prosecuted. Id. On August 28, 2011, Mark Hogan was charged with

petit larceny, based on the aforementioned supporting depositions. Id. ¶ 40.

On July 3, 2014, Vandewater contacted the New York State Police and accused Mark

Hogan of trespass and criminal mischief. Id. ¶ 41. Vandewater notified the State Police that

Plaintiff had driven an SUV over a snow stake and left "ruts" in the grass on Vandewater's

property. Id. ¶ 42. In his supporting deposition to police, Vandewater stated that he "witnessed

Mr. Hogan in his black Lexus SUV traveling from his cottage at a high rate of speed" and "both

heard and observed Mr. Hogan drive his vehicle over 3 of the fiberglass stakes." Id. ¶ 45. At his deposition in this action, Vandewater testified that he did not see who was driving the vehicle but assumed that the driver was Mark Hogan because it was his vehicle. Id. ¶ 46. Mark Hogan denies having committed these actions. Id. ¶ 41. Vandewater signed two informations charging Mark Hogan with trespass. Id. ¶ 43.

As confirmed in Mark Hogan's affirmation and Vandewater's reply declaration, all of these charges were ultimately dismissed on speedy trial grounds. Dkt. No. 107 ¶ 8; Dkt. No. 112 ¶ 24.

In his reply declaration, Vandewater generally insists on the veracity of the aforementioned accusations and charges and on his good-faith intentions in reporting Mark Hogan's alleged conduct to police. Dkt. No. 112 ¶¶ 15–25.

On September 3, 2016, Vandewater reported to the New York State Police that Mark Hogan had removed several traffic cones from state land. Vandewater SMF ¶ 12; Response to Vandewater SMF ¶12. In his affirmation attached to his response to the Vandewater Motion, Mark Hogan maintains that, less than an hour earlier, Vandewater had confronted Mark Hogan and accused him of stealing the cones, and that in response, Mark Hogan "assured him that they belonged to [him], not the state, and were not 'stolen.'" Dkt. 107 ¶ 29. No arrest resulted from this report. Vandewater SMF ¶ 12.

### b. Facts Relevant to Negligence Claims

Mark Hogan maintains that on September 3, 2015, while the Prior Federal Action was pending, he injured his shoulder in a slip-and-fall accident that occurred on what he at that time regarded as his right of way to his Lots 19, 21, and 22. Response to Rose SMF ¶¶ 49, 52, 65 (citations omitted). Rose and Mark Hogan agree that the spot of land on which this occurred was

along the path that Mark Hogan treated as his right of way between the issuance of the West

Order in 2010 and the resolution of the Prior Federal Action in 2017. Rose SMF ¶ 52; Response

to Rose SMF ¶ 52.

Mark Hogan maintains that his fall was the result of erosion due to excavation work

performed by either Rose or someone else at Rose's direction, next to and underneath the right of

way. Id. ¶¶ 50, 72. According to Mark Hogan, this excavation work "hollowed out the ground

beneath Plaintiff's right of way[,] which allowed Plaintiff's foot to fall through the ground." Id. ¶

50. The parties agree that "[t]he general area where Mr. Hogan allegedly fell is wooded,

unimproved, and wild, having rough, hilled terrain and a steep embankment caused by a

disruption in the earth on the side of a hill. Rose SMF ¶ 53; Response to Rose SMF ¶ 53.

The parties also appear to agree that Mark Hogan was aware to some extent of the

relevant risks associated with surmounting this embankment. In 2010, "Mr. Rose had a red rope

line strung up along the edge of the steep embankment to warn anyone traversing the top of the

embankment of the drop-off and prevent them from inadvertently falling over the side of the

embankment." Rose SMF ¶ 55; Response to Rose SMF ¶ 55. As Mark Hogan acknowledges, he

testified in a 2012 deposition in the Prior Federal Action that he was aware that "the erosion and

instability had existed since 2006 or 2007." Response to Rose SMF ¶ 60. Rose states, and Mark

Hogan does not deny, that he testified in a deposition in this action that he had fallen and been

injured in the area in the past, on an unspecified date, within several yards of where he fell in

2015 and likewise within what he at the time of that deposition regarded as his right of way

pursuant to the West Order. Rose SMF ¶ 62; Response to Rose SMF ¶ 62. Mark Hogan had

spent significant time on and around the embankment in the years preceding his 2015 fall, as he

performed clearing work in the area after the conclusion of the West Action, cutting down trees

and removing foliage and brush on multiple occasions, including between 2010 and 2012 and in July 2014. Rose SMF ¶ 74; Response to Rose SMF ¶ 74.

Despite acknowledging his awareness at the time of his fall of hazards posed by the embankment, Mark Hogan maintains that he was not aware of the precise extent of the risk of falling through the embankment, a risk that had been exacerbated by excavation work conducted either by Rose or someone working on Rose's behalf on an unspecified date. Response to Rose SMF ¶¶ 56–62, 72. Mark Hogan maintains that the effects of this excavation were visible only from the vantage point of Rose's property, and that Mark Hogan had never viewed the embankment from that angle. Response to Rose SMF ¶ 50. Rose denies having performed any excavation work or directed anyone else to do so in the area where Mark Hogan allegedly fell. Rose SMF ¶ 72.

The parties agree that in May 2010, Vandewater had marked a suggested alternative route for Mark Hogan to use as his right of way, further into the woods and further away from Rose's cabins on his property. Rose SMF ¶¶ 63–64; Response to Rose SMF ¶¶ 63–64. Mark Hogan maintains, however, that this route was not safely traversable, because it was blocked by downed trees. Response to Rose SMF ¶¶ 63–64. Mark Hogan also states in his affirmation that this alternate path was not in his right of way as understood by reference to Lot 23's back line in either the Moncreif or Frymire surveys. Dkt. No. 113 ¶ 23.

Rose highlights what he regards as discrepancies in Mark Hogan's medical records documenting his alleged injury from this fall. Mark Hogan's medical records from Lewis County Hospital indicate that he went to the emergency room on September 4, 2015, and that he stated to a medical professional during that visit that he was suffering from a right shoulder injury he sustained while hiking the previous day, on September 3, 2015. Rose SMF ¶¶ 63–64; Response

to Rose SMF ¶ 66. Mark Hogan's September 9, 2015 medical report from OrthoVirginia

documents that Mark Hogan injured his shoulder while hiking on August 27, 2015. Rose SMF ¶

67. Mark Hogan's October 19, 2015 "Operative Report" from Harborside Surgery Center

likewise indicates that Mark Hogan sustained a shoulder injury while hiking on August 27, 2015.

Id. Mark Hogan maintains that the August 27 date is inaccurate and is based in both documents

on a mistaken notation by his orthopedist at OrthoVirginia. Response to Rose SMF ¶¶ 66–67.

Rose submits as evidence what he represents are photographs taken from his security

cameras between August 27, 2015 and September 3, 2015, none of which depict Mark Hogan

falling or injuring his shoulder. Rose SMF ¶ 69; Dkt. No. 96-10. Mark Hogan states that these

photographs do not depict the area where he fell. Response to Rose SMF ¶¶ 69–70. He also

maintains that these photographs omit certain periods of time within that date range. Id.

## III.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary

judgment if "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the

outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or

unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see

also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of

fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Hence, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.'" Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 WL 4805354, at *8 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV.    DISCUSSION

### A.  Malicious Prosecution

#### 1. Against Rose

Mark Hogan asserts a claim for malicious prosecution against Rose in connection with the petit larceny charge that arose from Mark Hogan's alleged theft of cables, sawhorses, and "No Trespassing" signs from Rose's property. For the reasons that follow, Rose's motion for summary judgment is granted as to this claim.

"Because 'accusers must be allowed room for benign misjudgments,' the New York Court of Appeals has held that the law 'places a heavy burden on malicious prosecution plaintiffs[.]'" Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004) (quoting Smith–Hunter v. Harvey, 95 N.Y.2d 191, 195 (N.Y. 2000)). In order to prevail, a plaintiff must establish that (1) the defendant initiated a criminal proceeding; (2) the proceeding terminated favorably to the plaintiff; (3) there was no probable cause for the criminal charge; and (4) the defendant acted maliciously. Id. Mark Hogan's claim fails on the first prong.

Normally, a citizen who reports a crime to law enforcement authorities cannot be held liable for malicious prosecution under § 1983. Indeed, in § 1983 actions in general, state actors generally can be held liable, while private citizens generally cannot be. Betts v. Shearman, 751 F.3d 78, 84–86 (2d Cir. 2014) (noting that "[u]nder 42 U.S.C. § 1983, constitutional torts are only actionable against state actors or private parties acting 'under the color of' state law," and that a private citizen is only so regarded when he acts "in concert with the state actor to commit an unconstitutional act.") (internal quotation marks omitted). In the context of malicious prosecution claims in particular, the existence of the institution of the public prosecutor generally precludes liability for private citizens who report crimes, because it is typically not within the private citizen's power to determine whether charges are brought, but rather within the absolute power of the public prosecutor. White v. Frank, 855 F.2d 956, 962 (2d Cir. 1988) ("Unlike the private prosecutor, the public prosecutor is absolutely immune from suit for malicious prosecution. The exercise of independent judgment by the public prosecutor and his active role in initiating criminal prosecutions may decrease the likelihood that a complaining witness will be considered to have 'caused' or 'procured' the prosecution, thus defeating grounds for liability

under this initial prong of the common law standard.") (internal quotation marks and citations omitted).

Rose argues, *inter alia*, that Mark Hogan has failed to establish the "initiation" prong of his malicious prosecution claim, because he has failed to sufficiently allege or provide evidence indicating that Rose had the requisite level of involvement in the relevant criminal prosecution or that his statements to police were false. Rose Mem. at 9, 14.[1]

Under the "initiation" prong of a malicious prosecution claim, a private citizen who reports a crime to law enforcement authorities can only be held liable if she (1) "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act," Rothstein, 373 F.3d at 293–94 (internal quotation marks omitted), or (2) provided information to law enforcement authorities that was "known to be false," Bornschein v. Herman, 304 F. Supp. 3d 296, 302 (N.D.N.Y. 2018) (Kahn, J.) (quoting Rivers v. Towers, Perrin, Forster & Crosby Inc., No. 07-CV-5441, 2009 WL 817852, at *3 (E.D.N.Y. March 27, 2009)). Regarding the first route for establishing a private citizen's initiation of criminal prosecution, "a defendant must do more than report a crime or give testimony." Manganiello v. City of New York, 612 F.3d 149, 163 (2d Cir. 2010). With respect to the second route, a defendant who gives false testimony is not liable, unless she does so knowingly. Bornschein, 304 F. Supp. 3d at 302 ("[A] mistake does not support liability for malicious prosecution.").

---

[1]  Rose moves in the alternative for both judgment on the pleadings and summary judgment with respect to this claim. See generally id. It is within the Court's "complete discretion" whether to treat Rose's motion as the former or the latter. See, e.g., Carione v. United States, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005). Because Mark Hogan had adequate notice that Rose intended to move for summary judgment on this claim, and because the motion for summary judgment has been fully briefed as to this claim with evidence submitted by both sides, the Court treats Rose's motion as one for summary judgment and not judgment on the pleadings. See Groden v. Random House, Inc., 61 F.3d 1045, 1052 (2d Cir. 1995); Bruno v. City of New York, No. 17-CV-7552, 2019 WL 690340, at *2 (S.D.N.Y. Feb. 19, 2019).

Mark Hogan fails to establish liability through the first route, because according to the evidence he has presented, Rose did little more than report a crime to police and provide testimony. See Manganiello, 612 F.3d at 163. Courts that have held that a private citizen initiated a criminal proceeding due to her active involvement in the prosecution have tended to base this conclusion on more extensive forms of participation by the private citizen defendant in the criminal process than occurred in this case. See, e.g., Mara v. MacNamara, No. 14-CV-1095, 2015 WL 4392956, at *1, *4 (D. Conn. July 15, 2015) (holding that the "initiation" prong was satisfied where the defendant private security officer personally participated in the plaintiff's arrest and drove the plaintiff and town police to the university security office for interrogation); Fowler v. Robinson, No. 94-CV-836, 1996 WL 67994, at *6 (N.D.N.Y. Feb. 15, 1996) (finding a social worker liable for false arrest based on an officer's testimony that the social worker "wanted [plaintiff] arrested" and was "rather insistent that [plaintiff] be charged," and that "in light of the paucity of evidence presented to him," if the defendant social worker "had not been so adamant," he would not have arrested the plaintiff).

Mark Hogan contends that Rose's involvement exceeded merely contacting the police and providing a supporting deposition. Mark Hogan asserts that after he was charged with petit larceny, Rose "repeatedly emailed Defendant District Attorneys Moser and Petzoldt as well as Lewis County Sheriff Deputy Lehman successfully urging them to take further legal action against him." Response to Rose SMF ¶¶ 38–39. But this assertion is not substantiated by the evidence that Mark Hogan submits in support. Mark Hogan cites an exhibit containing e-mails in which Rose informs these recipients of various allegations against Mark Hogan and encourages criminal prosecution. See Dkt. No. 113-8. But none of these allegations appear to relate to the

charges with which this malicious prosecution claim is concerned: in none of these e-mails does Rose mention Mark Hogan's theft of cables, sawhorses, or "No Trespassing" signs. See id.

Mark Hogan also fails to establish the "initiation" prong via the second route, as he has not presented evidence indicating that Rose knowingly provided false statements to police regarding Mark Hogan's theft of cables, sawhorses, and "No Trespassing Signs." Indeed, it is logically impossible that Rose *knowingly* provided false statements to police, because there is no genuine dispute regarding whether the allegations in question were true.

Mark Hogan admits that he removed these items from the spot of land in question. See Response to Rose SMF ¶¶ 28, 85. His contention that the allegations of theft and trespass are false is premised crucially on his factual claim that the land in question, namely the path that Mark Hogan established after the West Order in accordance with the 2003 Moncreif Survey, was his right of way. See Response to Rose SMF ¶¶ 27–31. By Mark Hogan's logic, Rose knowingly lied to police in alleging that Mark Hogan had stolen items from Rose's property, when in fact Mark Hogan had removed items that Rose impermissibly placed on what Rose knew to be Mark Hogan's property. Hogan Additional SMF (Vandewater) ¶ 109 ("Defendant Rose knew or should have known that Plaintiff was legally justified in removing obstacles in his ROW and taking steps to make sure they were not replaced.").

But as discussed, the court in the Prior Federal Action put the issue of ownership to rest. The court in that case credited the Frymire survey, which confirmed Rose's understanding of the location of the back line of Lot 23. Hogan, 2017 U.S. Dist. LEXIS 109702, at *13–14. Relatedly, the court found that in using what Mark Hogan regarded as his right of way, he had been traversing Rose's property, id. at *23, and that Rose, as the owner of the property, had a legal right to place the cables, sawhorses, and "No Trespassing" signs where he did, id. at *24.

18

Mark Hogan is barred by collateral estoppel from relitigating the issue of who owned the area in which Rose placed these items. "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94 (1980). While neither defendant has explicitly raised a collateral estoppel defense, the Court applies the doctrine nonetheless, as "[a] district court may raise the issue of collateral estoppel *sua sponte.*" Osen LLC v. United States Cent. Command, No. 18-CV-6069, 2019 WL 4805805, at *6 (S.D.N.Y. Sept. 30, 2019) (collecting Second Circuit cases).

Courts have applied the doctrine to bar relitigation of the issue of ownership, where that issue was determinative of the viability of a claim in a prior action. See, e.g., Truong v. Truong, No. 03-CV-3423, 2007 WL 415152, at *7 (S.D.N.Y. Feb. 5, 2007) (barring relitigation of the issue of the plaintiff's ownership of funds in a bank account and of the lawfulness of the defendant's action of blocking the plaintiff's access to those funds, where those issues were decided in the defendant's favor in a prior civil action); Allstate Ins. Co. v. Hoi Yat Kam, No. 10-CV-1652, 2013 U.S. Dist. LEXIS 207259, *24-25 (E.D.N.Y. Sept. 3, 2013) (barring relitigation of the issue of ownership of medical clinics for purposes of a civil claim under a state insurance statute, when the issue had already been resolved against the defendants in a prior criminal action).

The resolution of the very issue that is determinative here, namely the ownership of the spot of land from which Mark Hogan removed the cables, sawhorses, and "No Trespassing" sign, was necessary to the court's judgment in favor of Rose in the Prior Federal Action. See Allen, 449 U.S. at 94. Specifically, the issue of ownership was essential to the court's conclusion

that Rose's placement of these items did not constitute a private nuisance. <u>Hogan</u>, 2017 U.S. Dist. LEXIS 109702, at *24.

Moreover, Mark Hogan must establish not only that Rose's representation to police that he owned the land in question was false, but further that it was *knowingly* false. <u>See</u> <u>Bornschein</u>, 304 F. Supp. 3d at 302. That Rose's understanding of the location of his back lot line was ultimately vindicated in the Prior Federal Action at the very least strongly suggests that he had some basis for his position on the matter and thus that he made the relevant report to police in good faith.[2]

Mark Hogan has thus failed to create a genuine dispute of material fact bearing on the "initiation" prong of his malicious prosecution claim against Rose. The Court grants Rose's motion for summary judgment as to this claim.

### 2. *Against Vandewater*

Vandewater argues for summary judgment with respect to Mark Hogan's malicious prosecution claims, *inter alia*, on the ground that Vandewater was not sufficiently involved in any of the relevant criminal prosecutions to have "initiated" them. Vandewater Mem. at 3–4. The Court agrees, and grants summary judgment as to these claims for this reason alone.

By Mark Hogan's account, in all but the August 27, 2011 report, Vandewater did little more than report alleged crimes to police and provide testimony. <u>See</u> Hogan Additional SMF

---

[2] Mark Hogan also maintains that Rose provided photographs of the alleged incident to police that were "incorrect and/or altered." Response to Rose SMF ¶ 38. In support of this factual claim, Mark Hogan cites to a series of photographs that do not evidently prove or disprove his statement. <u>See</u> <u>id.</u>; Dkt. Nos. 113-15 to -19. He provides no context or explanation that might illuminate what these photographs depict, or how they bear on his contention that Rose manufactured photographic evidence in this instance. Accordingly, the Court declines to find a genuine dispute as to the authenticity of the photographs that Rose provided to law enforcement or as to Rose's state of mind in providing them.

(Vandewater) ¶¶ 24–49. For reasons explained, Mark Hogan cannot establish "initiation" on the basis of such conduct by a private citizen. See Manganiello, 612 F.3d at 163.

With respect to the August 27, 2011 report, the Court also finds Vandewater's involvement to be insufficient to establish "initiation." As described, Vandewater contacted the New York State Police and accused Mark Hogan of stealing a "No Trespassing" sign from Vandewater's property. Id. ¶ 37. In the course of his supporting deposition, Vandewater requested that police ensure that Mark Hogan was prosecuted. Id. ¶ 39. Given that reporting a crime and providing testimony is as a matter of law insufficient to constitute "initiation," see Manganiello, 612 F.3d at 163, the Court declines to find that a complaining witness's mere heated exhortation in the course of such testimony that the accused be charged erases a private defendant's immunity, particularly in the absence of any evidence that such exhortation crucially influenced the public prosecutor, cf. Fowler, 1996 WL 67994, at *6.

Regarding whether Vandewater knowingly made false statements to police, the Court notes that, with the exception of his factual claims with respect to the October 2010 report, Mark Hogan provides evidence bearing only on the veracity of Vandewater's accusations and not on his state of mind in uttering them to police. See Hogan Additional SMF (Vandewater) ¶¶ 24–49. As already discussed, providing false statements to police does not constitute "initiation" unless such statements are knowingly false. See Bornschein, 304 F. Supp. 3d at 302.

And while Mark Hogan has asserted, with respect to the October 2010 report, that Vandewater knowingly made false statements to police and provided police with fabricated evidence, Mark Hogan has not created any genuine factual dispute on this point. Mark Hogan contends, specifically, that Vandewater staged photographs of his friend's truck parked on

Vandewater's property and provided them to police to support his accusation that Mark Hogan had committed trespass. Hogan Additional SMF (Vandewater) ¶¶ 29–32; Dkt. 107 ¶ 17.

Mark Hogan's sworn statement in his supporting affirmation that Vandewater orchestrated this plot, "upon information and belief," Dkt. 107 ¶ 17, is not competent evidence at the summary judgment stage, because it is not based on personal knowledge. See Estate of Gustafson v. Target Corp., 819 F.3d 673, 677 (2d Cir. 2016); Fed. R. Civ. P. 56(c)(4).

Mark Hogan asks the Court, in the alternative, to draw the inference that this plot occurred, based on certain circumstantial evidence. As described, to support his accusation that Mark Hogan committed trespass by parking his red Chevrolet pickup truck on Vandewater's land, Vandewater provided police with photographic images purporting to depict Mark Hogan's truck. Hogan Additional SMF (Vandewater) ¶¶ 29–33. Mark Hogan maintains that the truck in the photograph could not have been his, because "his truck" had a yellow license plate and a large "4x4" sticker on the rear, while the truck in the photographs had a white license plate and no sticker on the rear. Id. ¶ 31. In his affirmation attached to his response to the Vandewater Motion, Mark Hogan maintains that Vandewater at the time had a friend who owned a red truck with a white license plate and no sticker on the rear of the car, Dkt. 107 ¶ 17, by which Mark Hogan means to suggest that the truck in the picture is likely to be Vandewater's friend's truck.

As an initial matter, the Court notes that the referenced photographs are black-and-white. Dkt. No. 107-1. This, combined with the grainy nature of the photographs and the truck's significant distance from the camera makes it impossible for the Court to discern any bumper sticker and to ascertain the color of the license plate or the truck.

But even if all such features of the vehicle were discernible in these photographs, the Court would decline to draw the tenuous inferences that Mark Hogan requests. He asks the Court

to infer from the fact that Vandewater has a friend who owns a red truck with a white license plate, not only that the truck in the picture is that friend's truck, as opposed to any other red truck with a white license plate, but also that Vandewater instructed his friend to place the truck there for the purpose of taking photographs to deliver to police. But the Court is required to draw only "reasonable" inferences in favor of the non-moving party, see Reeves, 530 U.S. at 150, and this is one is too speculative even to satisfy this lenient standard.

Accordingly, the Court grants Vandewater's motion for summary judgment as to Mark Hogan's malicious prosecution claims.

**B. Defamation**

Mark Hogan asserts a defamation claim against Vandewater based on his report to police that Mark Hogan had stolen traffic cones from state land. Vandewater argues for summary judgment with respect to this claim on various grounds, including that this statement is protected by a qualified privilege. Vandewater Mem. at 7. On this ground alone, the Court grants summary judgment as to Mark Hogan's defamation claim.

In New York, "[d]efamation is the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017). "To make a claim for defamation under New York law, a plaintiff must allege '(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm.'" Cain v. Atelier Esthetique Inst. of Esthetics Inc., 733 F. App'x 8, 11 (2d Cir. 2018) (quoting Elias, 872 F.3d at 104).

"New York courts recognize a qualified privilege for statements made to police officers about suspected crimes." Udechukwu v. City of New York, 333 F. Supp. 3d 161, 172 (E.D.N.Y. 2018) (collecting cases). In order to overcome this qualified privilege, a plaintiff must demonstrate either constitutional malice or common law malice. See Liberman v. Gelstein, 80 N.Y.2d 429, 437–438 (N.Y. 1992).

Constitutional malice, a concept developed in defamation jurisprudence involving public official and public figure plaintiffs, refers to the publication of a statement with "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not." Id. at 438 (alteration in original) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964)). "The Supreme Court has defined reckless disregard for the truth as a 'high degree of awareness of . . . probable falsity.'" Suozzi v. Parente, 202 A.D.2d 94, 101 (N.Y. App. Div. 1st Dep't 1994) (quoting Gertz v Robert Welch, Inc., 418 US 323, 332 (1974)).

Common law malice is "spite or ill will." See Liberman, 80 N.Y.2d at 437. To establish common law malice, it is not sufficient to demonstrate that the defendant generally harbors animosity toward the plaintiff, or that the plaintiff and defendant have a history of conflict. See id. at 539; Shapiro v. Health Ins. Plan of Greater New York, 7 N.Y.2d 56, 64 (1959). The plaintiff must show, more specifically, that spite or ill will motivated the allegedly defamatory statement at issue. Liberman, 80 N.Y.2d at 439 ("[S]pite or ill will refers not to defendant's general feelings about plaintiff, but to the speaker's motivation for making the defamatory statements."). And malice must be the sole motivation. See id. ("If the defendant's statements were made to further the interest protected by the privilege, it matters not that defendant also despised plaintiff."); Golden v. Stiso, 279 A.D.2d 607, 608 (N.Y. App. Div. 2d Dep't 2001) ("Once a qualified privilege is shown to exist, the burden of proof shifts to the plaintiff to

establish that the communication was not made in good faith but was motivated solely by malice.").

Summary judgment is warranted as to Mark Hogan's defamation claim, because he has failed to create a genuine factual dispute bearing on the existence of either form of malice and thus has failed to overcome Vandewater's qualified privilege. In an attempt to demonstrate Vandewater's malice, Mark Hogan submits a sworn statement that less than an hour before Vandewater reported to police that Mark Hogan had stolen traffic cones from state land, Vandewater had confronted Mark Hogan and accused him of stealing the cones, and in response, Mark Hogan had "assured him that they belonged to [him], not the state, and were not 'stolen.'" Dkt. 107 ¶ 29; see also Pls.' Mem. of Law in Opp'n to Vandewater Mot. at 11 ("Plaintiff had already told Vandewater that the cones belonged to him. Thus, he knew the statement to [the police officer] was false.").

Importantly, Mark Hogan does not represent that he provided Vandewater with any evidence to support his denial of the accusation. According to Mark Hogan, he merely asserted that he was not guilty. Based on well-established principles in constitutional malice jurisprudence, such a denial is as a matter of law not sufficient to demonstrate a defendant's recklessness in publishing a statement that contradicts the denial.

It is common in the context of defamation claims brought by public officials and public figures against newspapers for a plaintiff to argue that her denial of accusations of criminality or other wrongdoing when contacted by a journalist demonstrates that malice motivated the subsequent publication. Courts have consistently rejected such arguments. See, e.g., Edwards v. National Audubon Soc., 556 F.2d 113, 121 (2d Cir. 1997) ("Surely liability under . . . New York Times v. Sullivan cannot be predicated on mere denials, however vehement[.]"); Contemporary

Mission v. New York Times Co., 842 F.2d 612, 624 (2d Cir. 1988) (holding that church officials' denying having accused priests of forging documents for their ordinations when contacted for comment prior to an article's publication did not establish a newspaper's liability for allegedly defamatory statements on the subject); MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP, No. 17-CV-7568, 2018 U.S. Dist. LEXIS 169669, at *26 (S.D.N.Y. Sept. 29, 2018) (noting that "allegations that a speaker knew of a plaintiff's denial of wrongdoing are insufficient to establish actual malice," and collecting cases).

This principle is based on an understanding that "such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." Edwards, 556 F.2d at 121. Something analogous is true in the circumstances of this case. Because it is unremarkable that a person accused of a crime would deny the charge, Vandewater's knowledge of Mark Hogan's asserted denial cannot by itself establish constitutional malice.

Mark Hogan also has not established common law malice. He and Vandewater's relationship is undoubtedly colored by hatred and their interpersonal history filled with lawsuits and other forms of disputes. And the circumstances arguably suggest that Vandewater spitefully contacted law enforcement to report a relatively trivial alleged violation. But Mark Hogan has presented no evidence indicating that spite or ill will was the *sole* motivation behind the police report in question, as opposed to a partial motivation alongside a desire to report what Vandewater perceived to be a crime. See Liberman, 80 N.Y.2d at 439.

Because Mark Hogan has not created any factual dispute as to the existence of malice, he has failed to overcome Vandewater's qualified privilege. Summary judgment is accordingly granted as to Mark Hogan's defamation claim.

### C.  Negligence

Vandewater and Rose move for summary judgment on Mark Hogan's respective negligence claims against them. For the reasons that follow, Vandewater's motion for summary judgment is granted with respect to this claim, while Rose's is denied.

#### 1.  Against Vandewater

"[A] person who lacks ownership or control of property cannot fairly be held accountable for injuries resulting from a hazard on the property." Galindo v. Town of Clarkstown, 781 N.Y.S.2d 249, 252 (N.Y. 2004). More precisely, a defendant cannot be held liable unless she owns, occupies, controls, or has made "special use" of the property. See, e.g., Aversano v. City of New York, 265 A.D.2d 437, 437 (N.Y. App. Div. 2d Dep't 1999) ("It is well settled that liability for a dangerous or defective condition on property is generally predicated upon ownership, occupancy, control or special use of the property . . . Where none is present, a party cannot be held liable for injuries caused by the dangerous or defective condition of the property") (internal quotation marks omitted) (ellipses in original); Wisdom v Reoco, LLC, 162 A.D.3d 1380, 1381 (N.Y. App. Div. 3d Dep't 2008); Greco v. City of Buffalo, 128 A.D.3d 1461, 1463 (N.Y. App. Div. 4th Dep't 2015).

It is undisputed that Mark Hogan fell and was injured on the path that he treated as his right of way between the issuance of the West Order and the conclusion of the Prior Federal Action in 2017—that is, a path along Lot 23's back line as depicted in the 2003 Moncreif survey. See Rose SMF ¶ 52; Response to Rose SMF ¶ 52; see also Dkt. No. 107 ¶ 26 ("On or about September 3, 2015, I was walking on my legally designated right of way as delineated by the Moncreif survey, stipulation of Vandewater, and Order of Judge Merrell."). As Judge Rothstein determined in the Prior Federal Action, this path that Mark Hogan persists in calling his "legally

designated right of way" was in fact on Rose's property. <u>Hogan</u>, 2017 U.S. Dist. LEXIS 109702, at *13–14, *23.[3] Mark Hogan thus fell and was injured on property owned by Rose and not Vandewater. For reasons discussed, Mark Hogan is barred by the doctrine of collateral estoppel from arguing otherwise.

He does not, alternatively, argue or present any evidence that Vandewater occupied, controlled, or made special use of the property. Rather, Mark Hogan asserts that Vandewater believed at the time that the location of the alleged injury was on his property, and that this belief begat a duty to maintain the property in a safe condition. <u>See</u> Pls.' Mem. of Law in Opp'n to Vandewater Mot. at 14 ("At that time, all parties accepted that the land belonged to Vandewater. It was not until July 2016 that a new survey was argued to control . . . However, at the time of Plaintiff's fall, September 2015, Plaintiff, Vandewater, and Rose operated under the assumption that the earlier surveys were correct."). The factual premise that the parties agreed that this area belonged to Vandewater is questionable, to say the least, given that the Prior Federal Action arose precisely from a disagreement over this issue.

But even if this factual claim were true, Vandewater could not be held liable for Mark Hogan's injury. Mark Hogan cites no legal authority for the proposition that a defendant acquires a duty to maintain someone else's property in a safe condition if the defendant mistakenly believes that she owns the property; and there is no such pincriple.

---

[3]  The parties agree also that, in his deposition in this action, Mark Hogan was unable to identify the precise location of his fall from photographs and could point only to a general area encompassing parts of both Rose and Vandewater's properties. <u>See</u> Rose SMF ¶ 51; Response to Rose SMF ¶ 51. By the Court's analysis, Mark Hogan's inability to identify the location of his fall with precision from photographs during a deposition is not necessarily inconsistent with his representation that he recalls being injured while on his purported right of way.

Accordingly, Vandewater's motion for summary judgment is granted as to Mark Hogan's negligence claim.

### 2. *Against Rose*

Rose moves for summary judgment with respect to Mark Hogan's negligence claim on a variety of grounds. For the reasons that follow, the Court denies Rose's motion for summary judgment as to this claim.

"New York landowners owe people on their property a duty of reasonable care under the circumstances to maintain their property in a safe condition," and this duty extends equally to licensees, invitees, and trespassers. Tagle v. Jakob, 97 N.Y.2d 165, 168 (N.Y. 2001).

In New York, the contours of this duty vary depending on whether the hazardous condition in question is a natural geographic phenomenon or an artificial one. A property owner has no duty to protect visitors from a hazard posed by a natural geographic phenomenon if the hazard is "open and obvious." See Melendez v City of New York, 76 A.D.3d 442, 443 (N.Y. App. Div. 1st Dep't 2010) (collecting cases across appellate Departments).

But the rule differs for artificial hazards. Id. In the past, many New York courts held that property owners had neither a duty to warn visitors of "open and obvious" dangers nor a duty to protect visitors from them. See MacDonald v. City of Schenectady, 308 A.D.2d 125, 126 (N.Y. App. Div. 3d Dep't 2003) (noting the trend). But in recent years, all four Departments have adopted the position that a hazard's "open and obvious" quality negates only the defendant's duty to warn and not her duty of care. Niles v. 1109-1113 Manhattan Ave. Partners, LLC, No. 13-CV-5427, 2015 WL 6674833, at *3 (E.D.N.Y. Oct. 30, 2015) (noting that "[a]ll four Departments of the Appellate Division have rejected the proposition that a landowner is

completely insulated from liability because an allegedly dangerous condition is open and obvious," and collecting cases).[4],[5]

The logic behind this distinction is clear. The "open and obvious" quality of a hazard itself serves as a warning and thus appropriately negates a landowner's duty to warn. See, e.g. Cupo v. Karfunkel, 1 A.D.3d 48, 51 (N.Y. App. Div. 2d Dep't 2003) (noting that "a landowner has no duty to warn of an open and obvious danger," because "[u]nless a hazard is latent, a person entering the property is just as aware as the landowner of the condition of the property and the risks associated with it"). But this logic has no application to the distinct duty to maintain a property in a reasonably safe condition. See id. Indeed, in application to the latter duty, this principle would have the perverse consequence that "landowners would be least likely to be held liable for failing to protect persons using their property from foreseeable injuries where the hazards were the most blatant." Id. at 52; see also Westbrook v. WR Activities-Cabrera Mkts., 5 A.D.3d 69, 73–74 (N.Y. App. Div. 1st Dep't 2004) (noting that the principle would "stand[] in stark contrast to the basic concepts of premises liability: it would allow a landlord to leave unrepaired a dangerous defect, as long as it was obvious enough").

In his motion for summary judgment, Rose argues that the embankment was a natural geographic phenomenon, and that the risk of falling through the embankment was "open and obvious." Rose Mem. at 19–22.

---

[4] New York Courts do not appear to have extended this dichotomy to natural geographic phenomena, to which courts have continued to apply the traditional categorical "open and obvious" rule in cases involving a defendant's duty to maintain property in a safe condition. See Melendez, 76 A.D.3d at 443 (collecting cases).

[5] Rose cites obsolete case law that predates this jurisprudential shift. See Rose Mem. at 20 (citing Russell v. Archer Bldg. Ctrs., 219 A.D.2d 772, 773 (N.Y. App. Div. 2d Dep't 1995)).

There is a genuine factual dispute as to whether the hazard at issue had a natural or artificial cause. Rose suggests that the relevant risk was caused by natural erosion. Rose SMF ¶¶ 53, 72. Mark Hogan, by contrast, maintains that the hazard in question was caused by excavation that Rose conducted at some point between 2007 and 2015. Response to Rose SMF ¶¶ 50, 60. He submits as evidence that such excavation occurred his sworn statement that it has. See Response to Rose SMF ¶¶ 56–62, 72; Dkt. No. 113 ¶ 18. Rose submits a sworn statement that he has not conducted any excavation. See Rose SMF ¶ 72; Dkt. No. 86-2 ¶¶ 53, 55.

Rose argues that Mark Hogan's sworn statement is not competent evidence at the summary judgment stage, because it is not based on personal knowledge. Rose Reply at 9. But while Mark Hogan does not explicitly state that he personally observed the excavation, the Court can reasonably infer his personal knowledge of the excavation from the facts that he is Rose's neighbor and that he frequently traversed the area of the alleged excavation throughout the relevant time period. See Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990) ("That Rule 56[]'s requirement[] of personal knowledge . . . ha[s] been met may be inferred from the affidavits themselves.") (internal citation omitted); Woods v. Amazon.com, LLC, No. 17-CV-4339, 2020 U.S. Dist. LEXIS 115003, at *9 (N.D. Ill. July 1, 2020) ("[A]n affiant's personal knowledge may be inferred from the affidavit itself, and in determining whether to make such an inference, the Court can consider a variety of factors, including the position of the affiant as well as his involvement in the matters he testifies to."). The parties' competing sworn statements regarding excavation, both based on personal knowledge, establish a genuine factual dispute. See, e.g., Gen. Elec. Capital Corp. v. NET Transportation, Inc., No. 04-CV-316, 2006 WL 8447262, at *3 (D. Conn. May 4, 2006) ("In ruling on summary judgment, the Court cannot credit averments made in plaintiff's affidavit over that of the defendants.").

31

Accordingly, in order to be entitled to summary judgment, Rose must establish the absence of any genuine factual dispute relevant under the standard of liability that applies to artificial hazards.

When a hazard is artificial, its "open and obvious" nature will only negate the landowner's duty of care if the hazard is also not "inherently dangerous." See Niles, 2015 WL 6674833, at *4 ("[A] court is not precluded from granting summary judgment where a condition was both open and obvious and not inherently dangerous.") (citing Cupo, 1 A.D.3d at 51); Segarra v. Delta Airlines, Inc., No. 18-CV-8135, 2020 WL 3127879, at *8 (S.D.N.Y. June 12, 2020) ("Even if a condition is open and obvious, a landowner's failure to establish that the condition is not inherently dangerous requires a court to deny summary judgment."). "In assessing inherent dangerousness, the Court may consider factors including the inherent nature of the condition at issue, evidence of prior accidents, whether there is a statutory violation, the frequency of inspections, photographs depicting the condition, and expert testimony." Chaney v. Starbucks Corp., 115 F. Supp. 3d 380, 386 (S.D.N.Y. 2015) (collecting cases).

Rose has not addressed inherent dangerousness. See generally Rose Mem. He thus cannot carry his initial burden to demonstrate the absence of a dispute of material fact bearing on his satisfaction of his duty of care, regardless of whether he has shown the absence of a factual dispute regarding the "open and obvious" nature of the relevant hazard. The Court need not determine whether Rose has demonstrated the absence of the latter factual dispute.

Rose additionally argues that summary judgment is warranted because Mark Hogan has admitted to cutting down trees and removing foliage and brush from the area of the embankment on multiple occasions in the recent past, see Response to Rose SMF ¶ 74, and that this more likely caused Mark Hogan's injury than any excavation Rose undertook. Rose Mem. at 23–24.

To the contrary, the parties' dispute over but-for causation is a factual dispute characteristically unsusceptible to summary judgment. See, e.g., Montauk Oil Transp. Corp. v. S.S. Mut. Underwriting Ass'n (Berm.), 859 F. Supp. 669, 681 (S.D.N.Y. Aug. 24, 1994) (noting that the "issue[] of . . . causation . . . frequently involve[s] disputes of fact and [is] rarely appropriate for resolution on summary judgment."); Krofft Entertainment, Inc. v. CBS Songs, Div. of CBS, Inc., 653 F. Supp. 1530, 1535 (S.D.N.Y Feb. 23, 1987) (noting that "dispute over causation presents a proper jury question") (internal quotation marks omitted).

Finally, Rose argues for summary judgment on the ground that the alleged fall and injury did not actually occur. Rose emphasizes discrepancies in Mark Hogan's medical documentation as to whether his fall occurred on August 27 or September 3, 2015. See Rose Mem. at 22. Rose also submits what he represents is a series of security camera photographs of the area taken throughout that period, none of which capture Mark Hogan. See id. at 22–23; Dkt. No. 96-10 to -11. Mark Hogan, for his part, states that the August 27 date listed on some medical documentation was recorded in error; that the photographs do not capture the precise area in which he fell; and that the photographs, which do not capture every moment that passed on September 3, 2020, omit the moment of his injury. See Response to Rose SMF ¶¶ 65, 69–70. Discrepancies as to the date of the fall in Mark Hogan's medical records could only conceivably bear on his credibility, and do not create the type of factual dispute that would warrant summary judgment. See Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir. 2003) (noting that "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment") (internal quotation marks and citations omitted). And, mindful of the Court's obligation to restrict itself to identifying disputes of fact, and to abstain from weighing the evidence, Mark Hogan's sworn

statement that he fell in a place and at a time not captured by these photographs is sufficient to create a genuine dispute as to whether the fall occurred.

Because Mark Hogan has presented competent evidence that he suffered an injury due to an artificial hazard on Rose's property, and because Rose has not met his burden to show that he satisfied his duty of care toward Mark Hogan, Rose's motion for summary judgment is denied as to Mark' Hogan's negligence claim.

### D. Loss of Consortium

Elizabeth Hogan asserts a claim for loss of consortium based on injuries that derive from Mark Hogan's involvement in the criminal justice system consequent to Rose and Vandewater's complaints to police. Pls.' Mem. of Law in Opp'n to Rose Mot. at 14–15; Pls.' Mem. of Law in Opp'n to Vandewater Mot. at 15–16. Plaintiffs argue that Mark Hogan has spent long periods of time away from Elizabeth Hogan due to his "constantly traveling to New York State for criminal proceedings as a result of Defendants' frivolous filing and supporting through false evidence criminal complaints and charges against the Plaintiff," and having been "taken into police custody multiple times resulting in additional time spent away from his wife." Pls.' Mem. of Law in Opp'n to Rose Mot. at 15; Pls.' Mem. of Law in Opp'n to Vandewater Mot. at 16.

A claim for loss of consortium "represents the interest of an injured party's spouse in the continuance of a healthy and happy marital life," Millington v. Southeastern Elevator Co., 22 N.Y.2d 498, 505 (N.Y. 1968). Loss of consortium encompasses "loss of support, . . . love, companionship, affection, society, sexual relations, solace and more." Carr v. French-American Banking Corp., No. 88-CV-8607, 1991 U.S. Dist. LEXIS 2704, at 1–2 (S.D.N.Y. Mar. 6, 1991). A claim for loss of consortium is a derivative action "from the occurrence of injury to one spouse and the very fact of the marital relationship." Haspil v. Church of St. Cyril, 128 Misc. 2d 968,

971 (N.Y. Sup. Ct. 1985) (citing De Angelis v. Lutheran Medical Center, 84 A.D.2d 17, 22

(N.Y. App. Div. 2d Dep't 1981)).

Summary judgment is granted as to Elizabeth Hogan's claims for loss of consortium,

because they are premised solely on Mark Hogan's malicious prosecution claims, which have

been dismissed.

### E.  Punitive Damages

Rose and Vandewater request that the Court dismiss Mark Hogan's punitive damages

claims against them. See Rose Mem. at 12–13; Vandewater Mem. at 10.

"Punitive damages are meant to punish the defendant for his willful or malicious conduct

and to deter others from similar behavior." Milfort v. Prevete, 3 F. Supp. 3d 14, 23 (E.D.N.Y.

2014) (internal quotation marks omitted). "[T]o be entitled to an award of punitive damages, a

claimant must show a positive element of conscious wrongdoing." New Windsor Volunteer

Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 121 (2d Cir. 2001).

Both motions for summary judgment are granted as to punitive damages. The Court

grants Vandewater's motion as to punitive damages, because no claims against him remain. The

Court grants Rose's motion as to punitive damages, because only a negligence claim remains

against him, and "punitive damages are not available for ordinary negligence." Estate of Knaust

v. Contreras, No. 14-CV-2496, 2017 WL 3638440, at *11 (E.D.N.Y. Aug. 23, 2017) (quoting

Munoz v. Puretz, 301 A.D.2d 382, 384 (N.Y. App. Div. 1st Dep't 2003)); see also Rice v.

University of Rochester Med. Ctr., 46 A.D.3d 1421, 1423 (N.Y. App. Div. 4th Dep't 2017).

### F. Stanford's Cross-Claim

In answering Plaintiffs' Complaint, Stanford asserted a cross-claim against all other

defendants, alleging that Stanford is entitled to contribution or indemnification in the event that

Plaintiffs obtain a verdict or judgment against him. Dkt. No. 33 ¶ 66. Rose seeks summary judgment regarding this cross-claim, while Vandewater has not addressed this cross-claim. Stanford did not file any responsive briefing regarding his cross-claim. Docket.

"Where a properly filed motion [for summary judgment] is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers . . . shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Under such circumstances, summary judgment is appropriate where the movant's argument for summary judgment is "facially meritorious." See, e.g., Douglas v. Smith, No. 05-CV-1000, 2009 WL 789450, at *7 (N.D.N.Y. Mar. 20, 2009) (collecting cases).

Rose argues that Stanford's cross-claim against him should be dismissed, because none of Plaintiffs' claims against Rose "overlap with or arise out of the same alleged facts or circumstances as any of Plaintiffs' claims against Mr. Stanford." Rose Mem. at 25. Indeed, as discussed in the Court's prior summary judgment order, Plaintiffs' claims against Stanford concern events on September, 1 2016, in which neither Stanford nor Plaintiffs argue Rose was involved. See Dkt. No. 116 at 5–8.

Because Rose's argument for judgment as to Stanford's cross-claim is "facially meritorious," See Douglas, 2009 WL 789450, at *7, Rose's motion is granted as to Stanford's cross-claim.

V.      **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Vandewater's summary judgment motion (Dkt. No. 94) is **GRANTED**
**in its entirety**. All of Plaintiffs' claims against Vandewater are hereby **DISMISSED**; and it is
further

**ORDERED**, that Rose's summary judgment motion (Dkt. No. 96) is **GRANTED in**
**part and DENIED in part**. Mark Hogan's malicious prosecution claim against Rose, Elizabeth
Hogan's loss of consortium claim, Plaintiffs' request for punitive damages, and Stanford's cross-
claim against Rose are **DISMISSED**; Mark Hogan's negligence claim against Rose can proceed;
and it is further

**ORDERED**, that the Clerk shall **TERMINATE** defendant Vandewater from the docket;
and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order
on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**[6]

DATED:        October 16, 2020
              Albany, New York

_Lawrence E. Kahn_
Lawrence E. Kahn
Senior U.S. District Judge

---

[6]  Due to the delays and disruptions caused by the COVID-19 pandemic, some
cases/motions were not disposed of prior to the end of the reporting period.